**People of the State of Illinois, Plaintiff-Appellee, v. Homer Bailey, Defendant-Appellant.**

**Gen. No. 51,488.**

First District, Third Division.

December 14, 1967.

Rehearing denied January 25, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (James J. Doherty, Assistant Public Defender, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Richard A. Rinella, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

The defendant was indicted on a charge of committing the offense of burglary and for taking indecent liberties with a child. He waived a jury, was tried by the court, found guilty and sentenced to 5 to 15 years in the State Penitentiary. His sole contention on appeal is that the evidence does not establish beyond a reasonable doubt that he was the man who committed the crime.

At about 4:00 a. m. on October 21, 1965, 10-year-old Antoinette Hudson, who lived with her mother, brothers and sisters in a three-room apartment, was awakened by a man entering her bedroom window from the fire escape. She testified that from her bed, which was a few inches from the window, she observed the man go over and sit on the bed in which her 9-year-old sister Lynn was sleeping. The intruder then got up and went to look into the adjoining bedroom in which the girls' mother slept. He returned and sat down next to Lynn again and Antoinette went back to sleep.

Lynn testified that she was awakened by the man rubbing his hand on the inside of her thigh. She asked him his name and he replied, "Rock," and pushed her back down on the bed. She screamed and called her mother, whereupon the intruder ran out of the apartment through the front door. As he left he said, "The door was just open and I am closing it."

Mrs. Hudson testified that on the night in question she and her five children were sleeping in her three-room apartment. The children occupied beds in the first bedroom and she was sleeping in the second bedroom. There was also a man in her room who was not identified, but, as she testified, he was not in bed with her. She heard

her young daughter scream and then saw a man leaving the apartment through the front door. As she stated it, "When he opened the door, I see him as he was going out the door and the light, you know, shone. He went into the hallway." Her bed was by the open bedroom door so that she had a clear view of the door through which the intruder made his escape. She recognized him, but at that time only knew that his name was "Homer." She testified that she had seen him in her apartment three times previously and on two occasions at a friend's home.

Later on the same day the defendant went to the police station because, as he testified, a friend had told him the police were looking for him. He was questioned and released, but was arrested the following morning. That afternoon Mrs. Hudson picked him out of a lineup at the 21st District Police Station. At the trial Bailey was again identified as the intruder, this time by Mrs. Hudson and her two daughters.

Defendant argues, first, that Mrs. Hudson's identification was based on a "split-second glance at an intruder who was hurriedly departing from a dark apartment into a lighted hallway by a woman who had just been awakened and was still lying in bed." He rests his case on the argument that she was honestly mistaken. He points out that human sense perception and memory are fallible and asks us to take judicial notice of the fact that identification would be even more impaired where a witness only saw the person for a few seconds immediately after she awoke. Quoting Jeremy Bentham and others, defendant argues that although witnesses are the eyes and ears of justice, those eyes and ears are sometimes defective.

We are aware that visual perception is subject to error as are all our senses. That is not to say however that courts can no longer trust evidence which might be tainted by human fallibility. To make such an exclusion would in effect render impotent the administration of criminal law. Mrs. Hudson was only 12 feet from the defendant when

123

she recognized him. She knew him from previous meetings and she was positive that Homer Bailey and the intruder were one and the same person. Her identification was corroborated by her two daughters.

The child victim testified that she had had a good look at the intruder when he was sitting next to her on the bed. Defendant objected at the trial that she was incompetent as a witness because of her age. The trial judge examined her and concluded that she was competent and highly intelligent. Her sister likewise identified the defendant.

Defendant contends that Antoinette Hudson stated that she was unable to identify the intruder. At the trial she testified that she was absolutely sure that Homer Bailey was the man she saw coming through the window and walking around the apartment. Later on cross-examination she testified that at that time she did not know who it was, but it is clear that she merely meant by this that she had not known or seen the intruder before.

The two arresting officers testified that the defendant stated to them that he was in the building in which the Hudsons lived on the night of the crime, but that he did not go to the fourth floor where they lived. When he testified at the trial Bailey denied having admitted this, but he was unable to account for his whereabouts on the night in question, other than to say that he presumed he was south of Madison Street.

The testimony of the three witnesses who identified the defendant clearly supports the trial court's finding unless we adopt the view being urged upon us by the Public Defender with respect to the innate weakness of a conviction based on identification. This is presented at length in his brief. While not saying so specifically, he would have us ignore the rule that the credibility of a witness is for the trier of fact to determine and that only in exceptional cases should a reviewing court disturb the jury or the trial court's decision. The Public Defender

quotes at length from Wall, Eye-Witness Identification in Criminal Cases, 90, 119–122 (1965), that identifications are based on familiar associations and that frequently familiarity is based on a past experience unrelated to the crime. Several instances are cited in which persons identified a man as one whom they have known and later it was specifically revealed that he was not the man. Counsel likewise points to the fallibility of sense perception and human memory, setting forth examples of false identification, apparently for the purpose of pointing out that direct identification by a witness who has seen and known the defendant may in itself be a reason for disbelieving him. We recognize the possibility that courts being composed of human beings may commit error.

Sight is one of the great miracles of nature. Through an instrument hardly an inch in diameter we can see on earth where the air is clear, hundreds of miles and a sky many millions of miles away. This is not done by the eye itself, but by communication of the eye with the brain through thousands and perhaps millions of fibers. Nevertheless we know through countless daily experiences that the eye serves us accurately except on rare occasions. The common observation, "It must be true. I saw it with my own eyes," reveals the faith we have in occular vision. The conclusion the defendant would have us reach is that such evidence is not trustworthy because certain cases have revealed erroneous identifications. What percentage such cases bear to the whole is unknown and in all probability unknowable.

What then of other types of evidence, such as indirect or circumstantial. It was for a long time argued by both bar and laity that circumstantial evidence was inferior to direct evidence, but it has been subsequently recognized that under certain conditions circumstantial evidence may be more accurate than direct. There have been periods in which the alibi was in ill repute because it was supposed to be easy for a defendant to get a friend or

125

acquaintance who would testify that at a certain time and place he saw the defendant. But, as Professor Wigmore points out, it is impossible to ascribe a greater weight to one class of evidence than to the other, and each class has its special dangers and advantages. Nearly all evidence is produced through human beings and, as such, the weight to be accorded it is a matter of credibility to be determined by the jury. 1 Wigmore, Evidence § 26 (3rd ed, (1940)).

No reason whatever is assigned for any desire on the part of the State's witnesses to accuse the defendant falsely. The jury saw and heard them, as did the trial court. This is an advantage which a reviewing court cannot derive from the cold record.

The Public Defender concludes his argument as follows:

"As we see it, there is something shocking and terrifying about taking away five to fifteen years of a citizen's liberty under a split-second identification such as the one of record at the bar."

This, in a legal argument addressed to a reviewing court, borders on hysteria. We realize the serious import of our decisions within the limited sphere in which our judgment may be exercised. The Public Defender and his assistants are officers of the court and are expected to advise the court of the facts and the law which support their position. It has been considered a professional impropriety for a lawyer to throw onto the scale of justice his own emotional reactions. This is of no aid to the court. We welcome their zeal and earnest argument, but they must keep within the bounds of reason.

Judgment affirmed.

SULLIVAN, P. J. and DEMPSEY, J., concur.