**People of the State of Illinois, Plaintiff-Appellee, v. Clayton R. Dial, Defendant-Appellant.**

Gen. No. 50,475.

First District, First Division.

May 13, 1968.

346

 

Gerald W. Getty, Public Defender of Cook County, of Chicago (Frederick F. Cohn, Carolyn Jaffe, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, David B. Selig, and Robert B. Rosen, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

In a jury trial in which three indictments were consolidated and heard as one cause, defendant, Clayton R. Dial,

was found guilty of robbery "while armed with a dangerous weapon." He received three concurrent sentences of 10 to 15 years. On appeal defendant contends (1) that he was not proved guilty beyond a reasonable doubt, and (2) prejudicial trial errors occurred, which deprived defendant of a fair trial.

On June 20, 1963, at about noon, a man armed with a sawed-off shotgun entered the premises of the West-Lin Distributing Company, 3630 North Elston Avenue, Chicago. At gunpoint, he robbed two men, Raymond Fulton and Anthony Chrisos. He ordered the men into a washroom, where the three waited for the arrival of Brink's guards, who were to pick up the West-Lin receipts of the day before. After waiting about fifteen minutes, the man herded Chrisos and Fulton into an office, where he disarmed two Brink's guards. He ordered Hilda Meyer, secretary for West-Lin, to put the receipts in a bag and hand it to him. The four men and Miss Meyer were ordered into a washroom and, after five minutes, they came out and the man was gone.

About three months later, because of an anonymous telephone call, the police started an investigation, which resulted in defendant's arrest and indictment for the three West-Lin robberies of June 20, 1963.

At the trial, the witnesses for the State were Raymond Fulton, Anthony Chrisos, Ralph Joch, Hilda Meyer and Walter Murphy, a police officer.

Raymond Fulton, an auditor in the Illinois Department of Revenue, was at West-Lin on June 20, 1963. He testified that defendant resembled the man who had held him prisoner and committed the robbery. On a previous occasion in another courtroom, he saw defendant, who "started yelling about he was being framed, and the voice sounded just like the man that was in the washroom with me."

On cross-examination, Fulton said he was in the washroom with the robber for about twenty-six or twenty-

348

seven minutes. The man had a pencil mustache and wore a straw hat and wraparound sunglasses. He gave a description to the police that the robber "was something around 6 feet tall, weighed between 175 to 190 pounds, he was a light-complected Negro, that he had a little mustache and a straight nose. . . . I saw all the features of the man that weren't covered up."

Anthony Chrisos, a truck driver for West-Lin, who happened to be in the plant on June 20, testified in detail as to the robbery. He said, "I was able to see his face during the entire time I was in the washroom. I gave a description to the police." He stated defendant was the same man he saw on June 20, 1963, "except for the mustache is off."

Chrisos further testified that in October 1963 he appeared at the Shakespeare Avenue Police Station. Also present were Roy Johnson and Ralph Joch, the two Brink's guards, and police officers. "There were four colored fellows lined up side by side and we were asked if there was anybody in there that we recognized, and I said I did. I recognized the defendant. I'd say I was about three or four feet away from him. . . . They just asked us first if we saw anybody in the lineup we knew and we all said yes. Then we were asked to go up and put our hand on his shoulder, and all three of us walked up at the same time and put our hand on his shoulder. I gave a description to the police in the month of June. They made a drawing from my description." Chrisos looked at photographs shown to him by police officers but made no photograph identification.

On cross-examination, Chrisos was questioned at length about the description of the robber given to the police. On June 20 he was with the assailant for a total of about twenty minutes, and he had a good look at his face. He was clean-cut and had a pencil-striped mustache.

As to the lineup, Chrisos said the other three men in the lineup were shorter than Dial and two were real dark.

He was positive that the man he saw in the lineup was "Richard Dial." He heard no remarks from the police officers to the men in the lineup other than to turn around and to look from side to side. On redirect, Chrisos again identified defendant as the man who robbed him on June 20, 1963.

Ralph Joch, a guard for Brink's, Inc., testified in detail as to the robbery. He was able to get a good look at the man and observed his whole body. He viewed photographs four or five times, and on September 27 picked out a picture of the defendant. On October 2, 1963, he went to the Shakespeare Avenue Police Station and identified the defendant in a lineup of four persons— "I was two or three feet away from the person who I identified. I identified the defendant. He was also identified by Mr. Chrisos and Mr. Johnson. The police asked us if we recognized anybody in the lineup, and we all agreed yes. After the lineup was over they said, 'Which one?' We all pointed to the same gentleman in front of us. Mr. Johnson is now deceased." The first time he heard the name of "Richard Dial" was at the lineup on October 2, and later he said that he first heard the name on September 27 when the warrant was issued. The name was given to him by the police officers.

Joch was subjected to a lengthy cross-examination and persisted in his identification of defendant as the robber on June 20.

Miss Hilda Meyer, secretary for West-Lin Distributing Company, testified as to the details of that part of the occurrence which took place in her presence but made no identification.

Walter Murphy, the investigating police officer, testified that on September 25, 1963, by way of an anonymous telephone call, the police received information that "the man who had committed the robbery at the West-Lin Distributors was known as Richie, supposedly a male

350

negro about 6 feet tall, about 25 years old, light-complected and living in a building at 264 North Sacramento. The informer said he had a red and white Chevrolet and had gone to Crane Junior College at night." On that day they went to 264 North Sacramento and, finding no one who knew "Richie," they went to Crane Junior College and, on checking the records, found a "Clayton Richard Dial" who had attended night sessions and lived at 264 North Sacramento.

On the morning of September 27, the police officer and his partner went to defendant's home, and his father told them that defendant was not at home—"Then we saw the defendant, he came to the door and at that time we recognized him from a drawing that was made by these witnesses to the robbery. He perfectly matched that drawing, even had the same mustache he had on when he held up the place. . . . It is the defendant right here. . . . We asked him if he was Clayton Dial. He denied it and his father denied it. They said he was Clayton Dial's uncle." At that time the officers were informed that "if we ever wanted to talk to Clayton Dial we would have to get a warrant." The officer further testified that they obtained a photograph of Clayton Dial from the John Marshall High School. They put this photograph with 10 or 15 other photographs and showed them to Brink's truck driver, Roy Johnson, who "looked through the group of photographs and when he came to the picture you have in your hand there, he said, 'That is him.'" At this point the court overruled defendant's objection to the entire narration and motion that "it be stricken and declared for naught."

The officer further testified that the group of photographs was shown to "Ralph Joch, the other Brink's man," and when he came to the picture of Dial he stopped and said, "That is him." Joch then accompanied them to court and obtained a warrant charging "Clayton

351

Dial" with armed robbery. The warrant was secured on September 27, and on October 2 defendant surrendered.

Officer Murphy was present at the showup on October 2. The defendant and three other male Negroes were in the lineup, and they were viewed by Johnson, Joch and Chrisos. After the lineup was over, they were asked if they recognized anybody who was in the lineup, and they all stated they did. All three men then approached the defendant and pointed him out and stated he was the one who held them up on the 20th of June.

On cross-examination, the officer stated the first time he heard the name of "Clayton Richard Dial" was on the afternoon of September 25, and he got the name from the Crane Junior College because of the "anonymous telephone call." He obtained People's Exhibit 1 (the high school photograph), on which appeared "School Days, 56–57," from the office of the John Marshall High School. It was the only photograph of defendant that was in the group of photographs shown to Johnson and Joch, and this was "six years after the picture was taken."

Defendant testified and denied his involvement in the robbery. He said that on June 20, 1963, he was not working due to a strike. The strike ended about the 4th of July, and he went back to work for Bob Heller, a truck driver for Pepsi-Cola. Defendant was 24 years old, and he was 16 years old when the high school picture was taken. On June 20 he was at home asleep until noon, when he was awakened to eat lunch. Defendant's Exhibit 5 was a clothing receipt he received on June 20, when he purchased a bathing suit and sunglasses. During the month of June, he had a 1956 red and white "Chevvy." During the months of July and August, he was earning from $75 to $85 a week take-home pay. Defendant's Exhibit 6 was a loan certificate showing he borrowed $525 on July 15, 1963. He repaid the loan on September 19, 1963. He related that on September 26, the police offi-

cers came to his home looking for a "hit and run" driver, and he told them his name was "Bobby Jones." He refused to go with them because they did not have a warrant, and they told him they would give him a rough time. He turned himself in on October 2. He testified that he was 5-feet-10, and Exhibit 7 was an I. D. card given to him at the County Jail where he was photographed and measured on October 3, 1963. The card shows "Ht. 5–10, Wt. 176, Birth Date 5–13–40."

Defendant further stated that a police officer informed him that "it was a known stool or police informer that gave him information on me. And he stated that his name was Henderson and he lived on Douglas Boulevard in the 3500 block, and that's who he said fingered me. . . . I was arrested for armed robbery in Oak Lawn in 1961. I plead guilty; I was guilty. They put me on five years' probation."

Other witnesses for the defense included:

(1) Vanancia Hall, a clerk at 2959 West Fulton. She had known defendant for about five years, and during the month of June he came into the store every day about noon, and they would talk about the Pepsi-Cola strike. On June 20, 1963, she remembers talking to defendant in the store about noon.

(2) Lucille Davis lived at 264 North Sacramento and would babysit for "Richard's mother's grandchild." She saw him every day in June because of the strike. Generally she would awaken him and fix lunch for him. On June 20, he went shopping and told her he had his lunch. He didn't leave until around 12 o'clock, and it was 3:00 when he returned. He had a package with him, and his little niece pulled the things out of the bag, including tickets. She saw one of the tickets was dated June 20.

(3) Andrew Struke, a police officer, testified that on June 20 he talked to all the victims and got a description, which he entered in his report as follows: "Male negro,

353

30 to 35, 6–2; 180 to 185, light complexion, pencil mustache, wearing a yellow straw hat with loud band, wraparound sunglasses, tannish gray zipper jacket, black shoes, carrying a single barrel colt action shotgun, stock and barrel appear to be reasonably cut."

(4) Robert Heller, a driver for Pepsi-Cola Company, testified that defendant worked for him from September 1962 until September 1963. "During the time that he worked for me he was off only during the strike. The strike started on June 6 and lasted until July 6th. . . . [H]e did lots of heavy work. . . . He worked continuously through those two months of July and August."

(5) Clayton Dial, Sr., testified that on June 20, 1963, he left the home between 10:30 and 11:00, and defendant was at home at that time.

Considered first is defendant's contention that "the evidence is insufficient to support a conviction beyond all reasonable doubt." Defendant contends, "The States' entire case is based upon what is known as 'eyewitness identification.' There exists no other evidence connecting the defendant to the crime. Hence, the reviewing court must carefully scrutinize the 'eyewitness' evidence to determine whether it is sufficient to support a conviction beyond all reasonable doubt."

Defendant's brief shows exhaustive research on all facets of criminal identification. It is unusually well written and amply supported by authorities.

Under the heading of "Anatomy of an Identification," defendant discusses at length "The Human Fallibilities of Sense Perception and Human Memory." The subheadings include: 1. "Did the Identifier See the Assailant for a Sufficient Period of Time and Under Sufficient Lighting Conditions?" 2. "Was the Face of the Assailant Covered, Completely or Partially, Depriving the Identifier of an Opportunity to Adequately Observe the Assailant's Face?" 3. "Discrepancy Between the Description Given of the Assailant Soon After the Occurrence and the Physi-

cal Characteristics of the Defendant." 4. "Did an Extensive Period of Time Pass Between the Time the Identifier Saw the Assailant and the Time He Identified the Defendant as the Assailant?" Defendant also discusses at length "The Validity of Identification is Destroyed by Suggestion."

Defendant's authorities include People v. Peck, 358 Ill 642, 193 NE 609 (1934), where the court said (p 649):

> "In weighing the evidence of identification of one stranger by another, the attendant circumstances, together with the probability or improbability of affording an opportunity for a definite identification, must be considered and weighed, for, after all, the identification of one person by another who has never seen him before is an opinion or conclusion of the identifying witness."

In People v. Gold, 361 Ill 23, 196 NE 729 (1935), it is said (p 31):

> "It is apparent that, no matter how honest Levitus and Lipsitz were in their effort to identify defendant as the thief, the circumstances offered great opportunity for mistake."

In People v. Gardner, 35 Ill2d 564, 221 NE2d 232 (1966), it is said (p 572):

> " 'Of all the factors that account for the conviction of the innocent, the fallibility of eye-witness identification ranks at the top, far above any of the others.' (Inbau, Book Review, 57 J Crim L, C & PS, 376.)"

Other cited authorities include:

> "An honest mistake of identification . . . can hang an innocent man despite the most meticulous and fair-minded trial of his case." Cahn, The Moral Decision (1955), pp 258–259.

355

"Proof that relies wholly on the identification made by eyewitnesses is inherently weak; persons who merely saw a thief or attacker briefly and under conditions of stress, may, despite the best of intentions, too readily be mistaken." Kuh, Careers in Prosecution Officers, 14 Jur Leg Ed 175, 187, n 21 (1961).

Defendant also quotes at length from other authorities including Wall, Eye-Witness Identification in Criminal Cases (1965).

Defendant argues that Fulton spent more time with the assailant than any other eyewitness, and "at trial, he could only say that the defendant resembled the assailant. His testimony conclusively demonstrates that the identifications of both Joch and Chrisos were the results of a suggestive identification procedure and a positive identification from a photograph when such positive identification was in fact impossible."

On the issue of identification, the State contends that each of the witnesses had an ample opportunity to observe the robber, and the "in-court identifications" were based upon the personal observations of the witness while the armed robbery was in progress, and the "lineup identification" evidence was intended only for corroboration and as additional weight. The State also notes that the cross-examination of each of the identifying witnesses did not change their testimony. The authorities for the State include People v. Tunstall, 17 Ill2d 160, 161 NE2d 300 (1959), where it is said (p 163):

"The method or manner of identification is, rather, a matter which goes to the weight rather than the admissibility or competency of identification evidence. . . . Ordinarily the question of whether an accused has been identified as the perpetrator of a crime is a question of fact for the jury and, upon review, we will not reverse a conviction on the ques-

356

tion of the sufficiency of the identification unless it is contrary to the weight of the evidence, or is so unsatisfactory as to justify a reasonable doubt of defendant's guilt."

Also, People v. Donald, 29 Ill2d 283, 194 NE2d 227 (1963), where it is said (p 286):

"In weighing evidence of identification, the attendant circumstances, along with the probability or improbability of an adequate opportunity for a definite identification must be considered. . . . However, the positive identification by one witness who had ample opportunity for observation may be sufficient to support a conviction, even though such testimony is contradicted by the accused."

We have considered at length defendant's contention that the "eyewitness identification" in the instant case was insufficient to support a conviction beyond all reasonable doubt. We are aware that evidence of "lineup identification" and "pretrial confrontations" is currently being subjected to critical scrutiny to determine if substantial prejudice to a defendant's rights has occurred. While the lineup procedure followed here, as examined in the light of current pronouncements, could be found wanting, we find no substantial prejudice to defendant. Both Joch and Chrisos were positive of their "in-court" identification of defendant. Their identification testimony was clear and convincing and unshaken on lengthy cross-examination. Although Fulton testified defendant "resembled" the robber, he did say that the voice of the defendant sounded like the man that was in the washroom.

We are not persuaded that the application of the basic identification principles dwelt on by defendant requires a reversal of the defendant's conviction. A statement recently made in People v. Bailey, 90 Ill App2d 121,

357

234 NE2d 332 (1968), applies here. There, Justice Schwartz said (p 123):

". . . visual perception is subject to error as are all our senses. That is not to say however that courts can no longer trust evidence which might be tainted by human fallibility. To make such an exclusion would in effect render impotent the administration of criminal law."

■ We find the identification evidence was sufficient to support defendant's conviction beyond all reasonable doubt.

Defendant next contends that hearsay of a highly prejudicial nature was admitted in evidence, primarily (1) the testimony as to the identification of defendant by Johnson, the deceased Brink's guard, and (2) the testimony of Officer Murphy.

■ ■ We agree that it was error to allow the State to present testimony of what Johnson, deceased at time of trial, said and did at the lineup and when shown photographs. This evidence was offered for the sole purpose to prove that Johnson, before the trial, had identified defendant as the robber. Such evidence was hearsay, and "the error was further amplified by the assistant State's attorney referring to this evidence in his argument to the jury." People v. Reeves, 360 Ill 55, 64, 195 NE 443 (1935). See, also, People v. Cook, 33 Ill2d 363, 370, 371, 211 NE2d 374 (1965); People v. Ford, 89 Ill App2d 69, 82, 233 NE2d 51 (1967); and McCormick on Evidence, § 229, p 470. We find no prejudicial error here. This evidence was cumulative, and it supplied nothing substantial that was not in the record.

As to the testimony of Officer Murphy, defendant contends that prejudicial hearsay was included in his direct examination in that "the jury was presented with the testimony of an unknown party that the defendant was the assailant"; also, that Officer Murphy was allowed

to testify that in his opinion defendant was the assailant when he said, "Then we saw the defendant, he came to the door and at that time we recognized him from a drawing that was made by three witnesses to the robbery. He perfectly matched that drawing, even had the same mustache he had on when he held up the place."

■ The State argues that the informer's statement was not hearsay as it was not offered to prove the truth of the matter asserted therein. Cited in support is People v. Carpenter, 28 Ill2d 116, 190 NE2d 738 (1963), where the court said (p 121):

> "Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter."

The State contends that the information received from the informer was related by Officer Murphy only for the purpose of explaining how his investigation of the robbery led to the defendant, Clayton Dial, and was not offered as proof of guilt.

The testimony of Officer Murphy as to the description given by the unknown informer of the "man who had committed the robbery," was hearsay and improper when given at the trial on the issue of defendant's guilt or innocence. (People v. Williams, 38 Ill2d 150, 152, 230 NE2d 214 (1967).) It was an accusation of defendant by an unknown accuser, without the right of cross-examination, and was inadmissible as evidence against defendant. People v. Smuk, 12 Ill2d 360, 365, 146 NE2d 32 (1957).

■ ■ The further statement that "he perfectly matched that drawing, even had the same mustache he had on when he held up the place" was an improper opinion on issues to be determined by the jury, i. e., whether

defendant "matched the drawing" and if "he held up the place." The defendant was entitled to have his guilt or innocence determined by the jury, free from the opinions of his guilt made by the unknown informer and Officer Murphy. People v. Morgan, 20 Ill2d 437, 442, 170 NE2d 529 (1960).

The State asserts that defense counsel failed to properly object to the improper testimony of Officer Murphy and waived the right to claim error, and in the absence of objections, only those errors which are prejudicial to the rights of the complaining party are reversible. People v. Storer, 329 Ill 536, 161 NE 76 (1928).

On the question of objections made during Officer Murphy's testimony, the record shows that after his testimony about (1) the informer, (2) the police visit to defendant's home, and (3) the conversation with his former employer, defense counsel said, "I object to this narration, your Honor. I fail to see what materiality it has to bear upon the charge against the defendant. What is the connection?" As to the testimony that defendant matched the drawing and had the same mustache, no objection was made to this statement. Later, and after making a courtroom identification of defendant as the man he talked to at defendant's home "because he matched the description of the drawing," the officer added, "Today he is not wearing the mustache he was wearing on that day." At that time defense counsel said, "I object to that; if the court please, about a mustache."

 On the subject of timely objections to the admission of evidence, in People v. Trefonas, 9 Ill2d 92, 98, 136 NE2d 817 (1956), it is said:

> "An objection to the admission of evidence, to be available, must be made in apt time, or it will be regarded as waived. The general rule is that the admission of incompetent evidence must be objected to, if at all, at the time of its admission. Objections to evidence should designate the particular tes-

timony considered objectionable and point out the objectionable features complained of. Failure to make proper and timely objection to the admission of evidence claimed to be incompetent or otherwise objectionable or to move to strike it out after its admission, giving specific reason for the objection or motion to strike out such evidence generally constitutes a waiver of the right to object and cures the error, if any. . . . . A party cannot sit by and permit evidence to be introduced without objection and upon appeal urge an objection which might have been obviated if made at the trial."

And, in People v. Hester, 49 Ill App2d 308, 200 NE2d 3 (1964), it is said (p 311):

"Furthermore, a trial court is not obligated to exclude improper evidence where a defendant makes no objection, nor moves to exclude it."

Although some of the volunteered remarks of Officer Murphy were improper, either as hearsay or as his opinion bearing on the ultimate issue, reversible error is not demonstrated here. The disputed testimony of Officer Murphy was not solicited by the State, and it must have been obvious to the jury, as contended by the State, "that the police officer was merely reciting the circumstances of his investigation and embellishing it in his own language. They were well aware that Murphy was not an objective party tendering his expert opinion."

Finally, we find no merit in defendant's contention that "the cause should be reversed in order for the trial court to examine the police file to determine the existence of any statement of Chrisos to the police." The record confirms the State's contention and the trial court's findings that the State had given defendant "everything they have."

▇▇▇ We have examined this record to determine whether the cumulative admission of improper evidence

361

was so erroneous and prejudicial as to prevent defendant from receiving a fair trial. Plain errors or defects affecting substantial rights may be noticed, although they were not brought to the attention of the trial court. (People v. Wright, 65 Ill App2d 23, 34, 212 NE2d 126 (1965).) A review of the totality of the evidence shows that defendant was permitted liberal direct examination and cross-examination in all vital areas. Defendant did not make timely and proper objections to have the improper evidence excluded from the record or to have the jury instructed to disregard it. There was substantial positive identification evidence to support defendant's conviction beyond a reasonable doubt. We conclude the improper evidence heretofore discussed could not have affected the verdict.

For the reasons given, the judgment of the trial court is affirmed.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.