People of the State of Illinois, Plaintiff-Appellee, v. James McGrew (Impleaded), Defendant-Appellant.

Gen. No. 52,254.

First District, First Division.

November 18, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Herbert Becker, Norman W. Fishman and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James R. Truschke, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

In a bench trial, Joseph McGrew and Alford Brown, Jr., were found guilty of the offense of armed robbery. McGrew was sentenced to two to six years in the penitentiary and, on appeal, he contends that he was not proved guilty beyond a reasonable doubt.

On August 26, 1966, at about 10:30 p. m., Clemmons Otte approached his automobile, which was parked on Ogden Avenue in Chicago, and within a half block of the laundromat he operated at 1500 Clybourn. The area was illuminated by streetlights and by cars on Ogden. As Otte was about to enter his car, two men approached and

asked if he had any money. Otte replied he had $20. While defendant McGrew prevented Otte from entering the car by pressing his knee in the door and holding a knife, Brown removed Otte's wallet containing the $20.

On the same evening, Otte gave the police a description of the two men and told them he could identify both of them, but he knew one better than the other. On September 27, 1966, police officers came to his laundromat with about six pictures, and he identified pictures of McGrew and Brown as the two who robbed him on August 26. Later on the same day, at a lineup in the Chicago Avenue station, in which there were four Negroes of similar physical appearance, he "recognized both of them as the men who held me up." During the trial Otte identified McGrew and Brown as the men who committed the holdup.

On direct examination, Otte testified that he had seen Brown in his place of business "a hundred times or more," and "my wife used to do the laundry for him." He had seen McGrew in the laundromat "a couple of dozen times."

On cross-examination, Otte testified that he was 62 years old and wore glasses. He made no outcry, and McGrew had a knife in front of him. Brown brought his laundry in for a period of a year, and "my wife done that as a favor to them because they loved to play cards." They would leave the laundry, and after two or three hours they would return and pick it up and take it home.

Otte was cross-examined at length regarding the description he gave the police of his assailants and of what transpired when the police showed him the photographs and at the lineup. He said when the police officers showed him the pictures, he was asked, " 'Can you recognize any of these fellows as the men who held you up?' And as I looked at them I recognized both of them right away, and I said 'These are the two fellows.' He said, 'O. K., do you want to come to the station this evening?'

I said, 'Yeah, after I close up, after eight o'clock.' So I went there after eight o'clock, and that's when I recognized both of them as the men who held me up." He was not informed by the police that the men would be in the lineup. He was told to go to the station and look at a lineup. As to the question, "Now, in other words, you had that picture in your mind at the time when you picked these men out at your place of business, you could remember what these pictures looked like?," Otte responded, "Listen, I could have picked those men out of a thousand pictures. . . . I have had the pictures of these men in my mind—right along, from the date that I was held up until the day the officer came to my place of business. That's what I am trying to say. I didn't need no pictures to recognize the men, believe me."

Both Brown and McGrew testified and denied the robbery. Brown testified he lived with his parents. He knew Otte and went every week to the laundromat. He usually dealt with Otte's wife. "We left our clothes in the laundromat and she would take them and dry them for us." He testified as to his activities on the evening of August 26—he arrived home at about eight o'clock and stayed home all night.

Defendant McGrew denied the robbery or that he carried a knife. Brown and he were friends and met several times a week. He was not with Brown on August 26, and at the time of the robbery he was in a pool hall on North Avenue. As to Otte, he testified that he had seen him around the neighborhood, and "I used to go by the laundromat and see him." He did not see Otte on August 26.

Alibi witnesses testified for each of the defendants. Robert Griffin testified that on the evening of September 26, he played pool with defendant McGrew at a pool hall on North Avenue until 11:30 and then remained with him at McGrew's sister's home until the next morning. James Brown testified that he was with his brother, the de-

278

fendant, Alford Brown, throughout the evening at their home watching television.

Defendant McGrew's contention that he was not proved guilty beyond a reasonable doubt is based upon the assertion that Otte's identification was uncertain and police induced. He maintains that there was "no clear and positive identification of these men," and if Otte's identification of defendants "was clear and positive why was further identification by photographs and lineup necessary? . . . As a matter of fact, the only reason pictures were shown to Otte was to bolster up a doubtful and uncertain identification of the defendant and Brown."

Defendant's citations on single identification include People v. Ikerd, 26 Ill2d 573, 188 NE2d 12 (1963), where it is said (p 579):

> "This court has reiterated the rule that a conviction cannot be deemed to be sustained by evidence beyond a reasonable doubt if the identification of the accused was vague, doubtful and uncertain. . . . However, a single identifying witness has been held sufficient to sustain a conviction."

Defendant also quotes at length from Wall's Eye-Witness Identification in Criminal Cases, p 26:

> ". . . [I]n court identification is of little testimonial value, however necessary it may be for a conviction. The witness knows that the defendant is to be found in just one place in the courtroom, a fact sometimes emphasized by courts when assessing the value of such an identification. What is of crucial importance, however is the witness's original identification of the defendant, for this original identification 'may quite conceivably decide the fate of the man . . . .' "

Defendant also argues that the testimony of the police officers as to what Otte said when shown the photographs and at the lineup was hearsay and inadmissible.

Defendant's citations on this point include People v. Wright, 65 Ill App2d 23, 212 NE2d 126 (1965), where it is said (p 28):

"In our opinion these statements made by the complaining witness and repeated by the police officers as to the identification of defendant are hearsay and inadmissible. The sole evidence involving defendant in the crime was the testimony of the complaining witness. The effect of such additional statements was to give the impression to the jury that the evidence against defendant was corroborated."

Defendant also asserts that the lineup in which the complaining witness viewed the defendant was improperly composed and conducted, and the identification thus made was invalid and inadmissible. Defendant argues there were only four men in the lineup, and "in view of the faulty composition of the lineup the purported identification of the defendant McGrew and of Brown was unfair and improper and not admissible in evidence." On this point defendant's authorities include People v. Gooden, 403 Ill 455, 86 NE2d 198 (1949), where it is said (p 460):

"It is quite possible that the face in the picture examined by Benton at the bureau of identification would remain indelibly upon his mind, and having fixed an association of defendant's picture in his mind in connection with the robbery, it is quite possible that upon viewing defendant in the lineup Benton might have been influenced by what he had observed in the picture."

Defendant also cites Wall, p 41:

"As will be pointed out later, however, the number of persons in the lineup obviously has an important bearing upon its fairness, and the smaller the number

280

of participants, the more will the lineup resemble a showup, and partake of all its weaknesses."

■ We are not persuaded that defendant's authorities apply to the facts in this case. Defendant's theory on single identification and some of defendant's authorities were discussed at length by this Division in People v. Dial, 95 Ill App2d 345, 238 NE2d 122 (1968). The identification testimony of the instant complaining witness was unusually positive. He knew both defendants, having seen them many times at his place of business, and both defendants testified that his testimony was correct. At the scene of the holdup, lighting conditions were good and Otte had ample opportunity to view them. Considering the conditions under which the defendants were observed, and considering that Otte's identification was positive, credible and unshaken on cross-examination, we think it is clear that the identification of defendant McGrew was not "vague, doubtful and uncertain." We cannot see how Otte's photograph and lineup identifications, if improper in any manner, or the incompetent and hearsay testimony of the police officers with regard to the identification of McGrew by Otte, were "so unduly prejudicial as fatally to taint his [defendant's] conviction." We conclude the identification of defendant McGrew was sufficient to establish him guilty beyond a reasonable doubt.

As to defendant McGrew's alibi evidence, the remarks made in People v. Capon, 23 Ill2d 254, 178 NE2d 296 (1961), apply here. At p 257, it is said:

"[T]he alibi evidence of the defendant is in conflict with the evidence of the robbery victim. However, a consideration of the whole record reveals that defendant had a fair trial and was proved guilty beyond a reasonable doubt."

Finally, defendant contends that the court's examination of James Brown and Officer Hill was prejudicial to him, and that such examination was wholly unnecessary and improper. Defendant's authorities include People v. Krejewski, 332 Ill 120, 163 NE 438 (1928), where it is said (p 125):

> "This court, however, has more than once said that the examination of witnesses is the more appropriate function of counsel, and the instances are rare and the conditions exceptional which will justify the presiding judge in conducting an extensive examination. It is always embarrassing for counsel to object to what he may deem improper questions by the court. Then, in conducting a lengthy examination it would be almost impossible for the judge to preserve a judicial attitude. While he is not a mere figurehead or umpire in a trial and it is his duty to see that justice is done, he will usually not find it necessary to conduct such examination. The extent to which this shall be done must largely be a matter of discretion, to be determined by the circumstances in each particular case, but in so doing he must not forget the function of a judge and assume that of an advocate."

Considering the nature of the questions, the circumstances of this case and the fact that this was a bench trial, we find no abuse of discretion here. A trial judge has the right to question witnesses in order to elicit the truth or to bring enlightenment on material issues which seem obscure. The propriety of such examination rests largely in the discretion of the trial court, and this is especially true where the cause is tried without a jury and the danger of prejudice lessened. People v. Palmer, 27 Ill2d 311, 314–15, 189 NE2d 265 (1963).

We conclude there was substantial positive identification evidence to support defendant's conviction beyond

a reasonable doubt, and the trial errors, if any, were not prejudicial.

For the reasons given, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.