(No. 35445.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIE J. EVANS, Plaintiff in Error.

*Opinion filed May 25, 1962.—Rehearing denied September 27, 1962.*

CHARLES A. LAFF, and LOUIS B. TISHLER, JR., both of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, and E. MICHAEL O'BRIEN, Assistant Attorneys General, and JOHN T. GALLAGHER and RUDOLPH L. JANEGA, Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE HERSHEY delivered the opinion of the court:

A jury found defendant guilty of rape and fixed his penalty at 199 years in the penitentiary. On this writ of error, he contends that he was not proved guilty beyond a reasonable doubt, that the trial court committed reversible error in the admission of evidence, and that statements made by the prosecution in closing argument were so prejudicial as to deprive him of a fair trial. We shall consider these contentions in order.

There is no question but that the complaining witness was the victim of a brutal rape. Defendant contends, however, that the identification of him as the man who committed the crime is insufficient.

The complaining witness, Mrs. Elizabeth Joiner, testified that, at about 10:00 P.M. on February 6, 1956, she was on her way home from a theater party. She was walking along 60th Street in the city of Chicago and was near the entrance of the Plaisance Hotel when she noticed a colored man walking toward her. The lighting at that location was described by the witness as very bright and very clear, with new street lighting throwing a very clear bluish-white light. As she and the man were about to pass one another, the man drew a knife and told her to turn around and walk back. She identified this man as the defendant. She drew back against the building and pleaded with the man to let her go, as first a woman and then a man passed,

but her assailant threatened to kill her if she turned her head or if she didn't keep her mouth shut. He then forced her at knife point down the street to Harper Avenue, southward on Harper Avenue for a short distance, then through an areaway between buildings and across a parking lot to where the Illinois Central right of way met the fence line of a vacant lot. Then the man forced her to climb over a concrete embankment and then over a fence. He faced her with the knife pointed at her and ordered her to take off her pants and lie down. The witness testified that she could see the man at this time and that, although it was dark, she had fairly good vision. She described the man as wearing a tan camel-hair fabric top coat, a dark gray fedora hat, and dark trousers. The man then raped her at knife point.

She testified that, during the course of the rape, the man talked to her and asked numerous questions and that, when he questioned her, he raised his head and looked down into her face, and that she could see him. She further stated that a couple of times when he raised his head she could get a very clear look at his profile, after her eyes had become accustomed to the darkness. He kept the knife on her during the rape, except that, on one occasion, she found the knife loose and using it struck at his shoulder, which so infuriated him that he threatened to kill her, beat and kicked her unmercifully, and then left. She made her way to a nearby house, called the police, and was taken to a hospital for emergency treatment.

The complaining witness testified that her purse, which she had with her at the time of the assault, but which was not recovered afterward, contained, among other items, a library card for the Woodlawn library, issued to her in her maiden name, Elizabeth S. Krueger. On February 11, some five days after the crime, the buzzer to her room in her apartment building at 6056 Stony Island rang and, when she asked who it was, the party ringing answered that he

was from the Woodlawn library and asked if Elizabeth S. Krueger lived there. Mrs. Joiner slammed the door and called the police to tell them her assailant was in the building. About this same time on February 11, the complaining witness's sister-in-law, Mrs. Geneva Krueger, who lived in an adjoining apartment, looked out her front window and observed a man whom she described as a colored man, wearing a finger-tip, loose coat and a cap with a bill. Just then, Mrs. Joiner called her on the telephone, and, as a result of that telephone conversation, Mrs. Krueger's husband and son ran outdoors to try to catch the man.

Shortly thereafter defendant was arrested by officers O'Mara and Dixon. Officer O'Mara testified that at about 11:00 A.M. on February 11, 1956, he and Officer Dixon were sent to 6054 Stony Island, where they met Krueger and his son and were given a description of a man. They then drove north on Stony Island to 60th and west on 60th to Harper Avenue, where they found the defendant and placed him under arrest. As the car turned onto Stony Island headed in the direction of 6054, defendant, according to the testimony of O'Mara, jumped up and said, "You got the wrong man. I am not the man." At 6054 Stony Island, Mrs. Krueger, according to O'Mara's testimony, identified the defendant as the man whom she had seen in front of the building.

The police then took the defendant upstairs toward the third floor apartment of Mrs. Joiner. According to the testimony of both Mrs. Joiner and Officer O'Mara, she immediately and unequivocally identified the defendant as her assailant. She identified him later in two police line-ups the same day. Earlier, between the time of the commission of the crime and the arrest of the defendant, she had been called to the police station to view another suspect and had said that he was not the man.

Defendant's landlady and another woman testified that defendant had spent the evening of the crime with them.

Actually, some of the testimony on this point did not account for defendant's whereabouts between 7:00 P.M. and 11:30 P.M., during which time the crime was committed. Also, the witnesses testifying to the alibi said defendant had asked them to do him a favor, although he had testified that he had not talked to them about the case. Defendant sought to show that this was a favor as to certain newspaper publicity.

Defendant seeks to argue that the complaining witness's identification of him as the man who committed the crime was not positive, but doubtful. However, the People's testimony is to the effect that the complaining witness positively and without equivocation identified defendant as the man who had raped her as soon as she saw him following his arrest, and that she also picked him out without hesitation or equivocation from two different police line-ups. This testimony is disputed by defendant's own testimony, which was to the effect that Mrs. Joiner did not at first positively identify him, but said only that he resembled the man, and also by his testimony that she failed to pick him out of one police line-up at which he was present. His testimony at these points is, however, contradicted by that of the People, both in their evidence in chief and on rebuttal. To the extent that plaintiff's contention is based upon this disputed testimony, the question concerns not so much one of the weight of the evidence as of the credibility of the witnesses. This, we have repeatedly held, is a matter for determination by the jury. (*People* v. *Fort*, 14 Ill.2d 491.) The record shows that the complaining witness had ample opportunity to observe her assailant prior to and during the commission of the crime, and her identification of the defendant was clear, positive, and convincing. The jury was fully warranted in believing the testimony of the People and in finding defendant guilty beyond a reasonable doubt. *People* v. *Johnson*, 23 Ill.2d 465.

Defendant also seeks to impeach the identification of

him as the assailant by pointing to the absence of any knife wounds on his body, the failure of the police to find any clothing in his possession like that which the prosecutrix had described her assailant as wearing, and a discrepancy between the height and weight in the description given the police by Mrs. Joiner and the actual height and weight of the defendant. We do not regard these factors as affording sufficient ground for a reversal of the finding of the jury. While the victim testified that she struck at the defendant with his knife, there was no evidence as to the effect of her attempt. In view of her small stature, the unfavorable position in which she was at the time, and the fact that her assailant was wearing a rather heavy coat, it cannot be presumed that her thrust inflicted any wound. Thus, the absence of knife wounds on the defendant's body does not of itself discredit the testimony of the complaining witness nor cast doubt upon her identification of the defendant as her assailant. Neither does the failure of the police to find the clothing allegedly worn by the defendant at the time of the commission of the crime raise a reasonable doubt of guilt. The defendant was not arrested until five days after the crime, and the assailant would have had ample opportunity to have disposed of any incriminating clothing during that time. The fact that defendant's witnesses testified that he did not own any clothing answering that description is primarily a matter of the credibility of witnesses to be determined by the jury.

It appears that, shortly after the crime, Mrs. Joiner gave the police a description of her assailant, in which he was described as a colored man, five feet five inches in height, weighing 140 pounds, with medium dark skin and a thin moustache, and wearing a dark gray hat with a wide brim, light camel-hair coat, dark sport shirt and dark trousers. On the trial defendant testified that he was 5 feet 10½ inches tall and that, at the time of his arrest, he weighed about 165 pounds. Defendant points to the discrepancy in

the height and weight in the description given the police and his actual height and weight and argues that this discredits the subsequent identification of him by the prosecutrix and creates a reasonable doubt as to his guilt. The defendant apparently fitted the description in other particulars and we are unable to attach any crucial significance to the discrepancy in the height and weight. It is a matter of knowledge that these matters are often deceiving, that few people are accurate judges of height and weight, and that many people are notoriously poor judges. Considering these factors, and also considering the fact that, while the witness had ample opportunity to observe the general appearance and the features of her assailant, the conditions to which she was subjected were hardly conducive to an accurate judgment of such matters. We are unable to regard the discrepancy between the description and defendant's actual height and weight as of decisive importance. The jury, who not only heard the testimony but saw the defendant in court, was in a far better position than are we to evaluate the weight to be given to the discrepancy in the description insofar as it pertained to defendant's height and weight, and we are unable to say that the jury was required to regard the discrepancy as sufficient to create a reasonable doubt as to defendant's guilt.

Had the testimony of the complaining witness in other respects been equivocal, uncertain, or unsatisfactory, it might well be that some of the factors urged upon us by the defendant should be deemed sufficient to create a reasonable doubt as to his identity. We cannot say, however, on the record in this case, that they were sufficient to cast doubt upon the clear and positive identification made by the prosecuting witness. The evidence is sufficient to prove the defendant guilty beyond a reasonable doubt.

Defendant next contends that the court committed reversible error in the admission of evidence. He contends, first, that the testimony of the complaining witness concern-

ing her alleged "caller" on the day of defendant's arrest, should have been excluded. Upon defendant's objection, the trial court said that the prosecution had a right to bring out this testimony "if they can connect it up." The prosecutor promised to connect it up, and said that, if it was not connected, the court could strike it and instruct the jury to disregard it. Defendant now contends that the prosecution failed to "connect up" this testimony, and that it should have been excluded. We cannot agree with this contention. It is proper to prove the facts and circumstances attendant upon the arrest of a defendant for the crime for which he is being tried where such facts and circumstances tend to connect him with the perpetration of the crime. (*People* v. *Carson*, 341 Ill. 11.) We think that sufficient connection was made to render the testimony admissible. There was testimony in the record that at the time of the assault the complaining witness had with her a purse containing a card for the Woodlawn library issued in her maiden name of Elizabeth S. Krueger. The testimony in question of the complaining witness indicates that her caller was a man who had made a connection between her address, the Woodlawn library, and the name Elizabeth S. Krueger, and reasonable inference from this evidence is that the caller had secured this information from the missing library card. This, together with the identification by Mrs. Krueger, sister-in-law of the complaining witness, of the defendant as the man she had seen in front of the apartment building at substantially the same time, is, in our opinion, a sufficient connection to make the evidence in question competent.

Next defendant contends that certain statements allegedly made by the defendant during the commission of the crime were irrelevant and immaterial and were highly prejudicial to the defendant and should have been excluded. The record fails to show that any objection was made at the trial to this evidence, and, therefore, this contention is not available on writ of error. We have, however, examined the

testimony in question, and, while it was undoubtedly highly damaging to the defendant, we agree with the People that it was competent to show the circumstances of the commission of the crime. See *People* v. *Pieper,* 410 Ill. 15; *People* v. *DeFrates,* 395 Ill. 439.

Defendant also contends that the prosecutrix's exhibition of her injuries to the jury was improper and prejudicial. He argues that these demonstrations had no tendency to prove the issues being tried and, at most, constituted mere cumulative evidence, since the injuries were fully described by the physician who examined the prosecutrix on the day following the crime. However, the fact that the jury had an explanation of the injuries does not in itself preclude the exhibition of them to the jury. (*People* v. *Hobbs,* 297 Ill. 399; *People* v. *Tilley,* 411 Ill. 473.) Defendant complains that the manner in which the injuries were demonstrated was improper and prejudicial. It is, however, impossible on the basis of the written record for us to determine the precise method in which the injuries were displayed or to evaluate its propriety or to determine any possible prejudice that may have resulted thereby. We think that the method in which the injuries were pointed out was properly a matter for the discretion of the trial court and, in the absence of anything in the record showing an abuse of discretion, cannot be considered as grounds for reversal.

As his final evidentiary point, defendant argues that the State's conduct in staging a showup of 13 police officers in the presence of the jury in an attempt to rebut defendant's testimony regarding police brutality was improper and prejudicial. On direct examination, defendant testified that, while in the custody of the police, he had been subjected to several beatings. On cross-examination, over the objections of the defense counsel, defendant was questioned in detail concerning the beatings, and, to rebut defendant's assertion that he was beaten, the State brought 13 police officers into the courtroom and had defendant identify those whom he

claimed had beat him. While this procedure was perhaps somewhat unusual, we cannot say that it was an improper method of rebutting defendant's testimony, nor are we able to see how defendant was prejudiced thereby.

Finally, defendant contends that statements made by the prosecution in its closing argument were so inflammatory and prejudicial as to deprive him of a fair trial. We have examined the argument in its entirety with particular reference to the portions complained of. While many of the statements made were undoubtedly highly damaging to the defendant and may well have influenced the jury in imposing the severe penalty that it did, we cannot say that, under the evidence properly admitted surrounding the occurrence, these statements transcended the bounds of legitimate argument. (*People* v. *Miller,* 13 Ill.2d 84; *People* v. *Stephens,* 6 Ill.2d 257.) The comment on the sentence the jury might return was properly within the scope of the law and the evidence. We find no reversible error.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*