**People of the State of Illinois, Plaintiff-Appellee, v. James Caldwell, Defendant-Appellant.**

**Gen. No. 52,582.**

First District, First Division.

November 24, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Herbert Becker, Norman W. Fishman, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James S. Veldman, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

In a jury trial defendant was found guilty of the separate offenses of (1) armed robbery, (2) attempt to commit deviate sexual assault, and (3) attempt to commit rape. Defendant was sentenced to the penitentiary for a term of 15 to 30 years on the armed robbery offense and for terms of 10 to 14 years on each of the other two offenses. The three sentences were ordered to be served concurrently.

On appeal defendant contends that he was not proved guilty beyond a reasonable doubt because (a) the method and procedure of the identification of defendant was unlawful and highly prejudicial and deprived defendant of his constitutional rights, and (b) during the trial evidence by police officers as to the identification made by the complaining witness should not have been admitted into evidence.

On November 3, 1966, the complaining witness was in the employ of the Palmer House as a cocktail waitress. On that evening she went to work at about eight o'clock, and while in the women's locker room on the 5th floor, she took off all of her clothing to make a change into her uniform. When she turned around she found a man standing there. He was taller than her, very skinny, and had a little black hat, black leather jacket and dark

pants. She thought he was one of the boys who worked in the hotel and told him to get out, but he didn't move. He put a knife to her throat and said, "Look lady, I could kill you if I wanted to." He then unsuccessfully tried to rape her. He then blindfolded and gagged her. He demanded that she commit an act of sexual deviation on him, which she refused. He then committed an act of sexual deviation on her. She screamed, and the blindfold and gag came off. He then took $48 out of her purse. She asked him not to take the money because it was part of her rent money, and he said he needed it more than she did because he was an addict. Screaming, naked and hysterical, she ran out of the door and down the corridor. A woman opened a door and told her to come in. She was in the offices of Dr. Duerme. The doctor gave her a sheet to wrap around herself. He examined her and found the outer part of her sexual organs smeared with blood. He cleaned her wounds and gave her a tranquilizer to quiet her. Two policemen took her to Wesley Hospital for further examination. The defendant was arrested at approximately 5:00 a. m. on November 5, 1966.

The complaining witness further testified that while she was in the doctor's office she was shown three photographs by Mr. Pierson, who was the Director of Safety and Security for the Palmer House. She picked out one (People's Exhibit 3) and said, "Yes sir, it is, that is exactly what he looked like almost." On November 4 at 6:00 a. m. she viewed a lineup of four men but identified no one. On November 4 at about 7:00 p. m. the police came to her apartment with a book of about 100 photographs, out of which she selected one (People's Exhibit 4). On November 5, 1966, at about 6:00 a. m. she attended a second lineup consisting of four men, and she identified the defendant in that lineup. At the trial she made an in-court identification and also

testified that during the attack on her the lighting conditions in the locker room were good, and the defendant was with her for about fifteen or twenty minutes.

Other witnesses for the State included Robert L. Pierson, who was the Director of Safety and Security at the Palmer House on November 3, 1966. At about 8:15 on that evening he went to the office of Dr. Duerme and showed three photographs to the complaining witness. She picked out one as being that of the defendant (People's Exhibit 3). On November 4, 1966, at about 7:00 p. m. he accompanied Police Officers Albertson and Strohlman and a Mr. Williams to the apartment of the complaining witness. She was shown a book of about 100 photographs, and she picked out one as being that of the defendant.

Robert Strohlman, a police officer, who was assigned to investigate "an attempted rape" at the Palmer House on November 3, 1966, testified that he and his partner arrived at the Palmer House as the victim was being taken to the hospital. Pierson showed him the alleged photograph of defendant (Exhibit 3). On November 4, he and his partner, Officer Albertson, interviewed the victim at her apartment and showed her about 100 photographs. She picked out one as being a picture of the man who attacked her on November 3 (People's Exhibit 4). He also testified as to the two lineups and the identification of defendant by the victim at the second lineup on November 5, 1966.

Officer Merle Albertson substantially corroborated the testimony of his partner, Officer Strohlman. Regarding Exhibit 4, he testified that when the complaining witness searched through the book of 100 photographs, she went through the book and came to one picture, then she hesitated. She then put her finger on that page and continued through the book, and when she finished she went back to the one picture and looked at it awhile

and said, "That is the man but he looks a little different than the other picture that I saw."

Dr. Francisco Duerme testified that he was a physician employed by the Palmer House. While on duty and about 8:00 p. m. on November 3, 1966, he saw the complaining witness in the office, nude and trembling. Her sexual organs were smeared with blood. She was frantic and had hysterical reaction to the incident. He gave her a tranquilizer and it took five minutes before he could communicate with her. After she calmed down he was able to converse with her, and she gave him answers to his questions just like any other patient. He never saw her again.

Ozel Anderson testified that on the evening of November 3, 1966, he was employed by the Palmer House as a lobby porter. He was going toward an elevator, and "a fellow came off the elevator in a hurry, in a daze and he jumped back in the elevator." The witness pointed out defendant as the man he saw. Also, he had examined photographs several days after the occurrence and identified Exhibit 4 as a picture of the man who stepped off and back on the elevator on November 3.

The exhibits offered in evidence by the State included the two photographs selected by the victim (Exhibits 3 and 4). Counsel for the defendant objected to their admission into evidence because "Exhibit 3 carries on the back of it in handwriting 'Junkie and shoplifter, Arcade Shops,' and I would not want the jury to observe this particular exhibit. To start with, it would be highly inflammatory. . . . I have also even greater objection to Exhibit 4 which shows him in a police photo. It is highly inflammatory. And the fact that he is identified by the witness from the stand is all that is sufficient and the effect of putting forth this evidence to the jury, compared to its probative value here is high-

ly inflammatory and prejudicial and I would say would sufficiently influence the mind of this jury to cause my client here not to be able to receive a fair and impartial adjudication of this matter." After some colloquy between court and counsel, the photographs were received in evidence and the court directed that the written data be "stricken off." This was done, and the two photographs were shown to the jury.

Defendant did not testify. The evidence offered on his behalf consisted of the testimony of his mother, Isabelle Lewis, with whom he lived. She testified that on the morning of November 3, defendant had a swollen foot and was limping, and she bathed it for him. Defendant was not working at the time, and he walked with great difficulty. After she left for work, she did not again see the defendant until after he was arrested.

In rebuttal, Officer Strohlman testified that during his investigation Mrs. Lewis stated to him that she had not seen defendant in several months. Robert Pierson testified he saw defendant on October 21, 1966, and he had a slight limp. He was present on November 5, when defendant was arrested, and to his knowledge defendant was not limping then. After he was placed in custody, he began to limp. Officer Albertson was present when defendant was arrested, and he did not notice any limp. The record officer of the County Jail testified that a medical record showed that defendant's foot was treated for a "fungi infection."

█ Initially, we consider defendant's contention that it was error to exhibit photographs of the defendant to the complaining witness before a corporeal identification was made. Defendant states, "Here she was twice shown a photograph of the defendant before the second lineup in which he appeared and the only one in which she identified him."

Defendant's authorities include numerous and lengthy excerpts from Wall's Eye-Witness Identification in

Criminal Cases, from which we note the following excerpts:

At page 68:

"[W]here a photograph has been identified as that of the guilty party, any subsequent corporeal identification of that person may be based not upon the witness's recollection of the features of the guilty party, but upon his recollection of the photograph. Thus, although a witness who is asked to to attempt a corporeal identification of a person whose photograph he has previously identified may say, 'That's the man that did it,' what he may actually mean is, 'That's the man whose photograph I identified.' "

And on page 71, it is said:

"No doubt there are circumstances in which the police of necessity make use of photographs but to make use of photographs beforehand to see whether important witnesses can identify an accused person whom they are afterwards going to see is to pursue a course which is not a proper one."

And on page 74:

"The first rule, one dictated by fairness and precaution, is that a series of photographs must be shown, not merely that of the suspect. To show a witness a single photograph 'is tendentious, for the psychological factors of such an exhibition . . . favor identification rather than repudiation of identity.' It is as grossly suggestive a procedure as is the show-up. It is a practice which is unfair not only to the suspect whose photograph is shown, but also to the community served by the police who show it. It is unfair to the suspect, for however innocent he may be, it may deal him a blow from

71

which he may not be able to recover. If the witness makes an identification, he will usually reaffirm it at the trial, and the jury may prefer to believe him rather than any denials on the part of the defense."

Also cited is People v. Gooden, 403 Ill 455, 86 NE2d 198 (1949), where the court commented on the problem of corporeal identification subsequent to a positive identification and stated (p 460):

"It is quite possible that the face in the picture examined by Benton at the bureau of identification would remain indelibly upon his mind, and having fixed an association of defendant's picture in his mind in connection with the robbery, it is quite possible that upon viewing defendant in the lineup Benton might have been influenced by what he had observed in the picture."

As to the use of photographs in this case, the State asserts that defendant's quotations from Wall were rejected as unrealistic in People v. Bailey, 90 Ill App2d 121, 123, 234 NE2d 332 (1968). The State argues that "the thrust of the objection to the photographic identification seems to be that the witness at the later lineup was identifying not the man who assaulted her but the face she saw in the picture she picked out. The fact that the picture she chose was the face of the man who had attacked her and that of the man she later picked out of the lineup is ignored in this argument which assumes that the photographic identification was incorrect. There is nothing to be found in the record however, to indicate either that any influence was exerted to cause the witness to choose a photograph of the defendant or that this choice was incorrect and not an identification of [the] attacker."

On the issue of the use of photographs here, we agree with the foregoing remarks of the State. In Wall, the author says (p 70):

> "The most obvious justification for the use of photographs is the absence of any knowledge as to the identity of the criminal. Without the aid of the rogue's gallery, the crime would most likely go unsolved; therefore, the proper use of photographs in such situations has always been approved, even by English courts, which are quite strict where identification procedures are concerned. Where the suspect is known and in custody, however, the showing of photographs to the witnesses is usually improper, even when the procedure used in showing them is a fair one. This point has been made in a number of English and Commonwealth cases."

In Simmons v. United States, 390 US 377 (1968), the court said (p 384):

> "Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint of both apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eye-

witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

We think the foregoing guidelines are in point here. It was the use of the photographs which led to the identification and arrest of defendant. We find no error here.

As to the lineups, defendant contends that "a lineup with only four men in it is not a proper procedure. There should be more than four." Defendant again cites Wall, where it is said (p 52):

"The composition of the lineup—how many persons are in it, what they look like, what they wear, who they are—is a matter of great importance, for unless it is completely free from suggestive influences, its value will be greatly diminished, if not destroyed.
. . .

"The first point to be considered here concerns the number of persons who appear in the lineup with the suspect. As already mentioned, the smaller the number of persons in the line-up, the more it resembles a showup. In England, it is said that line-ups contain about twelve persons, a number which Wigmore thought desirable. In Paris, the number is usually five or six which seems sufficient, if not ideal, and certainly far more feasible."

On this issue the State notes that on the morning following the attack and robbery, the victim was taken to the 2nd District police station, where she viewed a lineup of four men, in which the defendant was not present. The victim did not identify any of these men as her attacker and said that he was not there. Then,

on that same evening, a book of police photographs was shown to the victim, which contained a photograph of the defendant among approximately 100 others, from which she picked a photograph of defendant different from that which she had identified in the doctor's office in the hotel. The State further argues that the complaining witness knew what her attacker looked like, and she was not misled by other persons who were similar in appearance and was able to pick out his photograph from a number of pictures, and "that she knew this man when she saw him is further proven by the fact that at a second lineup [she] identified the defendant."

The record indicates that the second lineup consisted of four men, the defendant and three other men approximately the same description as that of defendant in size, height and weight.

■ We are aware that evidence of "line-up identification" and "pretrial confrontations" is currently being subjected to critical scrutiny to determine if substantial prejudice to defendant's rights has occurred. We note there is nothing in this record which shows that anyone made any remark or suggestion which might have indicated to the victim that the police thought defendant was her assailant. Also, there was nothing different about defendant from the men who stood with him in the second lineup which would have singled him out to an observer or somehow put him in the spotlight. We find nothing prejudicial to the defendant in the procedure followed in the second lineup.

Next considered is defendant's contention that the ordeal to which the complaining witness was subjected deprived her of the ability to clearly remember what her assailant looked like. She was frantic, trembling and had a hysterical reaction to the incident, and after the doctor gave her a tranquilizer, it took about five minutes before he could even communicate with her on

■■■■■■■■■■

any basis. Defendant asserts that her identification of the defendant by viewing his alleged photographs was vague, uncertain and wholly unsatisfactory. This was evidenced, he contends, by her hesitancy in choosing the photograph out of the book of 100 photos, and her statement when she viewed the original photograph: "That is exactly what he looked like almost."

We find no merit in this contention. The complaining witness was face to face with defendant for about twenty minutes in a well-lighted area, and she was able to give a description of him shortly after the attack. The lobby porter from the Palmer House testified that he saw defendant get off and hurriedly jump back on one of the elevators in the lobby shortly after the attack.

Finally considered is defendant's contention that part of the testimony of the officers who investigated this case, and who arrested this defendant, was inadmissible and prejudicial to the defendant and deprived him of his constitutional right to a fair trial. The police testimony noted by defendant as prejudicial consisted of statements made to them, or in their presence, by the complaining witness, that defendant was the man who attacked her when she identified a photograph of him and at the second lineup.

The State contends that at the trial defendant made no objection to the evidence in question and therefore any error was waived (People v. Dial, 95 Ill App2d 345, 238 NE2d 122 (1968)); moreover, that defense counsel cross-examined the witnesses at length on the same material, the identification of the defendant by the complaining witness in their presence.

■■ We have examined the testimony in question, and some of it is hearsay and improper. Although plain errors or defects affecting substantial rights may be noticed, notwithstanding they were not brought to the attention of the trial court (95 Ill App2d 345, 362,

238 NE2d 122 (1968)), we find no substantial prejudice here.

After a careful examination of this record, we find the identification of the defendant was clear and convincing, and the evidence was sufficient to support defendant's conviction of the three offenses beyond all reasonable doubt. For the reasons given, the judgment of the trial court is affirmed.

Affirmed.

ADESKO, P. J. and BURMAN, J., concur.