The People of the State of Illinois, Plaintiff-Appellee, *v.* Bobby Mack Brown, Defendant-Appellant.

(No. 69-112;

Third District—February 17, 1971.

STOUDER, J., dissenting.

Gene A. Petersen, of Peoria, for appellant.

Robert S. Calkins, State's Attorney, of Peoria, for the People.

Mr. PRESIDING JUSTICE RYAN delivered the opinion of the court:

The defendant was indicted for the crimes of Rape and Indecent Liberties with a Child. The jury found him guilty of both charges and he was sentenced to the Illinois State Penitentiary for not less than seven or more than 11 years.

In this appeal defendant claims: (1) That he was deprived of his right to counsel at the "lineup"; (2) That the pre-trial identification procedures were defective; (3) That the court erred in denying defendant's pre-trial discovery motion; (4) That the court erred in refusing to direct a verdict of not guilty on the indecent liberties with a child charge, and (5) That the state failed to proved defendant guilty beyond a reasonable doubt.

On March 4, 1969, the complaining witness Francine Knox, a 12-year old 6th grade student left school about 4 P.M. She had made arrangements to meet her mother at a house located at 837 West Third Street in Peoria. The mother was going to look at the house preliminary to renting the same. When Francine arrived at the house, no one was there, so she waited on the porch. About 10 or 15 minutes later a man came around the porch from the back of the house and went into the house. A few minutes later he invited Francine into the house to warm her hands. She first refused and then entered the kitchen. The man made some improper advances toward Francine and when she resisted he threatened to cut off her head with a saw he had in his hands. She then submitted. After the performance of the act, she ran home and told her mother and father that she had been raped. They then returned to the scene of the offense. No one was there so the police were called. Francine gave a description of the man to the police and then was taken to the hospital. An examination by a doctor indicated that she had had intercourse and blood was flowing from her genital tract. A smear taken from the back of the vagina indicated the presence of male sperm.

The defendant and his wife had been residing in the house where the act occurred for about two months. The owner had permitted them to live there rent free with the understanding that the defendant would do some repair work on the house. After Francine gave a description of her attacker to the police a pickup order was issued for the defendant. He was arrested about 24 hours later, advised of his rights and booked for the offense. During the trial Francine identified the defendant as the man who had raped her.

After the defendant was arrested, two police officers were directed to take six pictures to show to Francine. These pictures were of six different individuals—one picture being a picture of the defendant. Francine identified the defendant's picture as the man who had raped her. She and her mother were subsequently taken to the police station. The pictures had been taken from the police records department. Once they had been used

for the identification procedure they were returned to the files and no record was kept of the identity of the subjects in the other pictures.

There are some discrepancies in the testimony as to whether the pictures were shown to Francine on March 5, the day the defendant was arrested, or on March 6, the same day Francine and her mother were brought to the police station. In any event, on March 6 after Francine and her mother had been brought to the police station she viewed four persons in a lineup. At this lineup she again identified defendant as the man who had raped her. At that time the defendant did not have an attorney.

The defendant relies upon the *United States v. Wade*, 388 U.S. 218, 18 L.Ed.2d 1149 and *Gilbert v. California*, 388 U.S. 263, 18 L.Ed.2d 1178 to support his contention that the police denied him due process of law by placing him in a lineup when he was not represented by counsel. We are of the opinion that the defendant's constitutional right to counsel at this point in the proceeding was waived.

About an hour before the lineup a detective sergeant of the Peoria police department went to see the defendant in his cell. He advised the defendant that he was a possible suspect for the offense of rape of a young girl and that they wanted him to be in a lineup. He informed the defendant that he could have an attorney present and if he could not afford to hire one the court would provide him with an attorney. The defendant indicated he did not want an attorney. The sergenat gave the defendant a waiver of attorney form and asked him to read it. The defendent held it as though he were reading it and then signed it. The waiver specifically recites that the defendant had been advised that the police desired a person or persons to view him as a suspect of the offense of rape; that he had been advised of his right to have an attorney and his right to have the court appoint an·attorney. It recites that he waives his rights as explained to him and consents to being viewed without benefit of an attorney being present in his behalf.

The defendant was 19 years old. He now insists that he was an unsophisticated youth with no previous experience with law enforcement officers and that he was somehow taken advantage of by experienced police officials. There is nothing in the record to indicate that the defendant could not read or that he did not understand his rights when the same were explained to him. Everything in the record indicates to the contrary. At the hearing on a motion to suppress the identification held out of the presence of the jury the police sergeant testified as to the circumstances surrounding the execution of the waiver. The defendant offered no evidence at the hearing to contradict the testimony of the sergeant. The record indicates that the defendant knowingly waived his right to counsel. It has been held that the right to counsel at a lineup as guaranteed by *United*

*States v. Wade* and *Gilbert v. California* can be waived after an accused has been advised of his right to counsel and has been informed that counsel would be provided for him if he were indigent. (*People v. Fowler*, 76 Cal. Reptr. 2.) It has also been held that a court of review would not say that a minor above the age of 18 who signed a written waiver of his constitutional right to jury trial was deprived of his rights where the record did not disclose coercion, actual misapprehension or misrepresentation by a person in authority. (*People v. Harden* (1966) 78 Ill.App.2d 431; 222 N.E.2d 693. Affirmed 38 Ill.2d 559, 232 N.E.2d 725.) We hold that the same reasoning applies to the waiver by a minor above the age of 18 of his right to be represented by counsel at a lineup.

■■ We are not unmindful of a recent decision of the United States Circuit Court of Appeals for the Third Circuit (*U.S. v. Zeiler* (1970), 427 Fed.2d 1305) which held that the consideration that led the court in *Wade* to guarantee the right to counsel at lineups apply equally to photographic identifications after defendant is in custody. It appears in the present case that the defendant had not waived his right to counsel at the time of the photographic identification by Francine Knox but he did execute the waiver prior to the lineup viewing. However, the defendant did not in the trial court nor did he in this court raise the question of his right to counsel at the time of the photographic identification. We must therefore consider that the right to raise this question has been waived by the defendant and we are not at liberty to pass on the same. *People v. Smith*, 44 Ill.2d 82, 254 N.E.2d 492; *People v. Hanna*, 42 Ill.2d 323, 247 N.E.2d 610.

We also do not agree with the defendant's position that the pre-trial identification procedures were unnecessarily suggestive and conducive to mistaken identification. There are two aspects of the pre-trial identification that must be examined: (1) The identification of the defendant's picture, and (2) The identification of the defendant in the lineup.

The defendant insists that since he was already in custody as a suspect for the offense it was error for the police to exhibit photographs of the defendant to the complaining witness. In support of this contention defendant quotes from Wall, Eyewitness Identification in Criminal Cases at page 70 as follows:

"Where the suspect is known and in custody, however, the showing of photographs to the witness is usually improper, even when the procedure used in showing them is a fair one."

We are unwilling to arbitrarily condemn the practice of showing photographs to witnesses in all cases where the suspect is known and in custody. The United States Supreme Court has considered initial identification by photographs in *Simmons v. United States*, 390 U.S. 377, 19 L.Ed.2d 1247 and observed:

"Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint of both apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

■■ In determining whether the identification by photograph was proper, whether the defendant was or was not known or in custody at the time of the identification is not alone controlling. The test is whether the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*Simmons v. United States, supra., People v. Caldwell,* 117 Ill.App.2d 64, 253 N.E.2d 904.)

■■ The officers who took the six photographs to Francine's home both testified at the hearing to suppress the identification evidence. Though there are some discrepancies in their testimony concerning the date the photographs were taken to her home and the method of presenting them to her there is no evidence which indicates that the police officers by word or by the procedure employed in any way called Francine's attention to the defendant's photograph or in any way suggested that he was the one who attacked her. The evidence indicates that she viewed the six photographs one at a time and identified the defendant as her attacker. We cannot conjecture that the procedure followed or the words used in showing her the photographs were in any way suggestive. (*People v. Blumenshine,* 42 Ill.2d 508, 250 N.E.2d 152.) At page 511 the court in that case said that a defendant claiming that the viewing of the accused was so wanting in fairness as to deprive him of due process of law must prove that the confrontation conducted was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process. The same rule applies to the contention that the procedure used in showing the photographs to a complaining witness was suggestive. It is incumbent upon the one so claiming to make a record from which a court can determine or from which inferences can be drawn that the procedure

employed was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons v. United States, supra; People v. Caldwell, supra.*) We find nothing in the record in this case from which an inference to that effect can be drawn.

■■ There is one facet of the photographic identification procedure which was employed in this case of which we do not approve. No record was made or kept of the identity of the individuals who were the subjects of the other five photographs. The testimony indicates that these were pictures of various persons taken from the police files and following their use they were returned to the files. Although we cannot conjecture from this faulty procedure that any impermissibly suggestive conduct was involved, we do not approve of this practice.

■■ As to the procedure followed at the pre-trial lineup identification we likewise are of the opinion that the defendant has not proven that the confrontation resulted in such unfairness that it impinges his right to due process of law. The defendant had the burden of proving that such was the case. *Stovall v. Denno,* 388 U.S. 293, 18 L.Ed.2d 1199; *People v. Blumenshine, supra.*

■■ The evidence at the hearing to suppress the identification indicates that after Francine had identified the defendant from his photograph the police officers did not discuss the matter with her further. They later told her that the police Lieutenant wanted to talk to her and that they wanted her to view some suspects. She was not told that one of the suspects was the man whose photograph she had identified. At the police station she viewed four men in a lineup through a window that permitted her to see them but did not permit them to see her. All four were Negroes. The defendant was 19 years old. Two of the others in the lineup were 21 years old and 23 years old and the fourth was 47 years old. Aside from the fact that one of the four was 47 years old, there is no evidence in the record of any distinguishing dissimilarity in the appearance of the four men which would call the complaining witness's attention to the defendant. The record contained some general description of each of the four as to his height and build but does not indicate any distinction which would focus attention on the defendant. All four were dressed in coveralls. They were all in a room together and one at a time were directed to walk toward the window through which Francine was viewing them. The defendant was not required to perform in any manner different from the other three. There is no evidence that indicates that any comment was made by any one before or during the viewing that might have indicated or suggested to Francine that the defendant was the one who had attacked her. The defendant has not sustained the burden imposed by *Stovall v. Denno, supra,* and *People v. Blumenshine, supra.*

In view of the above analysis of the identification proceeding we do not believe that the procedures employed were such as to deprive the defendant of his constitutional right to due process.

■■ Prior to trial, defendant filed a motion for discovery naming specifically certain information and items desired and then included in the motion a "catch-all" request "to disclose evidence in the possession of People favorable to defendant generally on the issue of guilt." The court allowed the motion as to the specific request but denied that part of the motion quoted above. The defendant claims this order was prejudicial. We do not agree. The defendant was furnished with every piece of evidence which he specifically requested in his motion. During the trial from time to time defendant made further requests for the production of specific documents and the court ordered them produced. The defendant does not now claim that he was denied access to any specific piece of evidence which was in the possession of the people nor does the defendant indicate how he was prejudiced by the failure of the court to enter the "catch-all" discovery order. (*People v. Davenport*, 111 Ill.App.2d 197, 249 N.E.2d 328.) That part of the motion which the court denied did not attempt to identify any specific evidence sought to be discovered nor did it attempt to establish the competency, relevancy, and materiality of the evidence sought. Accordingly, the trial court did not err in denying the part of the discovery motion considered herein. *People v. Cagle*, 41 Ill.2d 528, 244 N.E.2d 200; *People v. Wolff*, 19 Ill.2d 318, 167 N.E.2d 197; *People v. Hoagland*, 83 Ill.App.2d 231, 227 N.E.2d 111.

The defendant next contends that it was error for the court to submit the offense of Indecent Liberties with a Child to the jury. The charge of this offense as contained in the indictment is as follows:

"/T/hat the said Bobby Mack Brown did lewdly fondle, touch and commit other acts too gross to be spread upon the records of this court upon the body of Francine Knox, said acts done with intent to satisfy the sexual desires of the said Bobby Mack Brown."

It is defendant's position that since there was no evidence of any fondling or touching of Francine other than the act of intercourse, it was improper to submit the charge of this offense to the jury.

The indictment is framed under the provisions of ch. 38, par. 11-4(a)(3) Ill. Rev. Stat. 1967, which provides:

"(3) Any lewd fondling or touching of either the child or the person done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the person or both."

■■ It should be noted, however, that in addition to the acts of lewd fondling or touching which are specified in the above quoted section as constituting the offense, the indictment also alleges that the defendant also

committed other acts upon the body of Francine Knox too gross to be spread upon the record of the court. The allegations of the indictment are sufficiently broad to include therein the act of sexual intercourse as constituting the offense of Indecent Liberties with a Child.

■■ In the Committee Comments to par. 11-4(a)(3) of the Criminal Code of 1961 (38 SHA 11-4) the author states:

"The language of subsection (a)(3) is probably broad enough to encompass those acts more specifically described in the two preceding subsections."

The two preceding subsections state that any act of sexual intercourse or any act of deviate sexual conduct by a person over 17 with a child under 16 constitutes the offense of Indecent Liberties with a Child. (See also *People v. Henderson*, 119 Ill.App.2d 403, 256 N.E.2d 84.) It was not error for the trial court to refuse to direct a verdict of not guilty on the charge of Indecent Liberties with a Child.

The final contention of defendant is that the State failed to prove him guilty of rape beyond reasonable doubt. Defendant complains that the competency of the complaining witness to testify was in grave doubt.

She was only 12 years old. On motion of the defendant a hearing was held out of the presence of the jury on the question of the competency of her to testify. She testified that she was in the 6th grade and can read and write and that she did not go to church or Sunday School. She said her parents had told her that some things are right and others are wrong. They told her she should obey her father and mother. She said the oath she took means she should tell the truth. Her mother told her she should tell the truth. She didn't know what would happen to her if she did not tell the truth. Her cousin had also told her to tell the truth. She said she would tell the truth in the courtroom. The next day following the hearing on the motion to suppress identification evidence the court inquired further into her competency to testify. In response to the court's questions she testified that she usually tells the truth but that she has lied. She thinks it is better to tell the truth than to lie and she usually does tell the truth. She said an oath is a promise to tell the truth and she will do that. She said she had told lies and had been caught and punished. On cross-examination by defendant's counsel she stated that if she told a lie she would probably be sent to Gift Home by the judge. She said nobody had talked to her about this between yesterday and today. She just remembered it. She did talk to her mother before coming to court today about a boy who had stolen a bike and had been put in Gift Home. She didn't talk to the police but did talk to the Assistant State's Attorney. He didn't say anything about telling the truth but told her to talk louder. The court ruled that Francine is a competent witness.

■■ The defendant would have us believe that the complaining witness' competency to testify is so uncertain that it was not established to the court's satisfaction until after the second hearing. The defendant implies that the Assistant State's Attorney had by the time of the second hearing thoroughly coached the witness as to what to say. The record does not support this contention. Her testimony at the second hearing is not substantially different than at the first hearing. At the first hearing she said she didn't know what would happen to her if she didn't tell the truth in court whereas, at the second she said the judge would probably send her to Gift Home if she lied. This difference is not decisive. At both hearings she indicated she knew it was better to tell the truth than to lie and she knew it was wrong to lie. She also testified that she had been punished for lying and stated that she would tell the truth in the courtroom.

■■ If the witness is sufficiently mature to receive correct impressions by his senses, to recollect and narrate the same intelligently and to appreciate the moral duty to tell the truth, the witness is competent to testify. The competency is to be determined by the trial judge. While his decision is reviewable, it is only where there has been an abuse of discretion or a manifest misapprehension of some legal principle that the decision will be reversed. *People v. Ballinger*, 36 Ill.2d 620, 225 N.E.2d 10; *People v. Davis*, 10 Ill.2d 430, 140 N.E.2d 675.

The trial judge had the benefit of having the opportunity to observe the complaining witness as well as to hear her spoken words and to observe the manner in which she delivered the same. We are not prepared to say on the basis of the cold printed record alone that the trial judge abused his discretion.

The defendant contends that if the complaining witness is determined to be competent to testify, her testimony is entitled to little weight and was proven unreliable. The basis of this contention is that she failed to tell the police officer that her attacker wore a red and white jacket when he approached the house or that he had "processed" hair both of which she testified to at the trial. The record does not establish that Francine did not tell these things to the police when she described her attacker. The police officer did not testify that she did not tell him her attacker had "processed" hair and wore a red and white jacket. The police officer was not testifying from any independent recollection when he gave the description of the attacker which Francine had given to him. He was then under cross-examination and he used such phrases in answering as "my report says" and "she must have told me because that is what is in my report." She did tell the police officer that the man was wearing a green and white striped shirt. She testified at the trial that he was wearing a green and white striped shirt. Another police officer testified he had ex-

amined the apartment on March 4 at about 5:15 P.M. and he went back at about 8:30 the same night. On the second visit to the apartment he found a white shirt with green stripes lying on the bed. It had not been there on his first visit. This was the apartment where the defendant lived. Defendant admits that he was wearing a red and white jacket and the green and white shirt which had been offered into evidence on the day in question but states that he went home and changed his clothes at about 2:30 or 3 o'clock P.M. He states he left them on the chair by the kitchen stove.

Francine also failed to identify a saw that was found on the premises as the one which her attacker had used to threaten her and she was confused as to whether the blanket which a police officer had taken from the bed was or was not on the bed when the attack occurred.

■■ The contradictions of Francine's testimony by that of the defendant and the testimony of his alibi witnesses (which shall be discussed later) involves a question of the credibility of the witnesses. (*People v. Evans,* 25 Ill.2d 194 at 199, 184 N.E.2d 836.) Any discrepancy or uncertainty in Francine's testimony does not necessarily mean that her testimony is unreliable but involves only the question of what weight should be given to her testimony which of course is a question for the jury to determine as is the question of the credibility of the winesses. *People v. Evans, supra,* at page 201.

■■ The complaining witness had ample opportunity to observe the defendant. She described her attacker to the police in the presence of the owner of the building with such clarity that a pick-up order was immediately issued for the defendant. Later that evening clothes matching the description given by Francine of those worn by her attacker were found in the defendant's apartment. Within a day and a half of the occurrence Francine identified the defendant's photograph and later she identified the defendant in a lineup and again identified him at the trial. Based upon this opportunity to observe and the positive identification corroborated by the description of the defendant's green and white striped shirt, we are unable to say that the jury was not justified in finding the defendant guilty beyond a reasonable doubt. Nor do we consider the fact that there was no scientific evidence connecting the defendant with the crime a fatal defect under such circumstances.

The defendants offered the testimony of four alibi witnesses to the effect that the defendant was in the home of a friend Roy Taylor from about 4 or 4:30 P.M. on the day in question until 6 P.M. Since the incident occurred between 4:15 and 4:30 P.M. defendant reasons that this testimony creates a reasonable doubt of his guilt. One of the witnesses was a first cousin of the defendant. In addition to this relationship there were several

instances where the testimony of these four witnesses did not correspond and in certain instances was contradictory or contradicted by the testimony of the defendant. For instance the defendant stated that earlier in the evening he rode with Roy Taylor to the Taylor house whereas, Taylor testified that the defendant did not ride home with him but came to his house later. Also Taylor said that he drove the defendant, Dora Rogers and Corrine Smith to Dora's house after 6 o'clock where they all got out including the defendant. The defendant testified that he did not get out at Dora's house but that Taylor drove him home. Although some of the witnesses testified that four people were in the car when they left Taylor's house, Corrine testified that Dora Rogers' brother also left with the group which would have made five persons that left together. Some of the testimony indicates that Dora and Corrine came to the Taylor house alone, whereas other testimony indicates that Dora's children were with her when they came to the Taylor house. We feel that there were a sufficient number of contradictions and discrepancies in this alibi testimony so as to cause doubt as to the credibility of the same in the minds of the jury.

■■■ An alibi is an affirmative defense and where the *corpus delecti* is proved, together with evidence tending to show the guilt of the defendant, the burden of establishing the alibi rests upon him although upon the whole case his guilt must be proved beyond a reasonable doubt. It is the function of the jury to make a determination of the credibility of witnesses and the weight to be given to the testimony. This court will not substitute its judgment for that of the jury merely because the evidence is conflicting. (*People v. Fort*, 14 Ill.2d 491, 153 N.E.2d 26; *People v. Wheeler*, 5 Ill.2d 474, 126 N.E.2d 228.) Where there is positive identification of a defendant by credible witnesses a guilty verdict may be sustained notwithstanding there may be otherwise uncontradicted alibi evidence and though the alibi witnesses may be greater in number than those identifying the accused. *(People v. Wheeler, supra.)* The testimony of a single witness if it is positive and the witness credible is sufficient to convict even though it is contradicted by the accused. (*People v. Pride*, 16 Ill.2d 82, 156 N.E.2d 551; *People v. Renallo*, 410 Ill. 372; *People v. Guido*, 25 Ill.2d 204.) As indicated above the complaining witness had an opportunity to observe the defendant. She described him and the clothes he was wearing to the police. She identified him from his photograph. She identified him in a lineup and she identified him at the trial. Furthermore, her testimony was corroborated by her description of the defendant's clothing which clothing was later found in the defendant's apartment, and admitted by him to have been worn by him on that date. In light of this we cannot say that the conviction of the defendant rests upon identification which is doubtful, vague and uncertain and which does not produce an abiding conviction of guilt

which situation would require us to reverse *People v. Fiorita*, 339 Ill. 78; *People v. Kidd*, 410 Ill. 271. Rather, we are of the opinion that the testimony presented does produce an abiding conviction of guilt and we conclude that the jury was justified in finding the defendant guilty beyond a reasonable doubt.

Judgment affirmed.

ALLOY, J., concurs.

Mr. JUSTICE STOUDER dissenting:

I do not agree with the majority of the court. I believe that the extra judicial identification process considered as a whole was unduly suggestive, irreparably prejudicial and not warranted by any practical imperative.

I am in agreement with the initial holding of the majority that defendant could and did understandably waive appointment of counsel and that such waiver was, as asserted by the majority, broad enough to comply with the requirements of *U.S. v. Zeiler*, 427 Fed.2d 1305. In this connection it seems to me that the result in Zeiler is in accord with the previous line of identification and representation cases in recognizing the critical nature of extra judicial identification and the problems relating thereto.

*Simmons v. United States*, 390 U.S. 377, 19 L.Ed.2d 1247 and *People v. Caldwell*, 117 Ill.App.2d 64, 253 N.E.2d 904, discuss at length the potential unreliability and subsequent consequences of photographic identification. Each case deals with identification made in advance of any suspect being taken into custody and each recognizes that the practical aid in law enforcement out weighs the adverse side effects which may result.

The same practical considerations do not exist when a suspect is already in custody and available for identification in person, if identification is thought necessary and appropriate. In *People v. Caldwell, supra,* the Court rejected defendant's contention that his identification by photographs before being taken into custody was erroneous and this is a specific issue decided. In discussing the general field of identification and particularly the observations of Wall, the court as dicta quoted with approval the following observations by Wall, "The most obvious justification for the use of photographs is the absence of any knowledge as to the identity of the criminal. Without the aid of the rogue's gallery, the crime would most likely go unsolved; therefore, the proper use of photographs in such situations has always been approved, even by English courts, which are quite strict where identification procedures are concerned. Where the suspect is known and in custody, however, the showing of photographs to the witnesses is usually improper, even when the procedure used in showing them

is a fair one. This point has been made in a number of English and Commonwealth cases.". By recognizing the distinction between photographic identification of a suspect in custody and one not in custody the Caldwell case offers more appropriate support for the proposition that the photographic identification in this case was impermissively suggestive rather than the contrary view of the majority. The Simmons case likewise appears to me to support a position contrary to that of the majority even though in its particular holding it approves photographic identification before apprehension of the suspect. It does so though only because of what it believes more compelling considerations i.e. benefit to the investigatory process and at least by implication that absent such considerations a different conclusion should follow. Additionally the court in Simmons noted that it was not approving all photographic identification preserving the right to consider that such identification might be unduly suggestive under circumstances not justifying the resulting prejudice.

The majority criticizes the photographic identification process as employed in this case but declines to give such criticism any meaningful effect. To suggest as does the majority, the defendant failed to sustain his burden of establishing prejudice from the identification procedure is belied both by the criticism of the procedure and its proved inadequacy. Where, as in the case at bar, the defendant was in custody and the eye witness made an identification of defendant based on photographs but the fairness of such identification can not be determined because the photographs were not preserved, it follows that such procedure could have been and therefore should be deemed unduly suggestive.

An extra judicial identification procedure initially unduly suggestive is not rendered harmless by thereafter holding a proper procedure. For example, if a subject in custody is identified in a one man line up, perhaps without his knowledge, the fast that he is thereafter identified in a proper line up does not vitiate the harmful effect of the initial improper identification. Where a proper lineup follows an unduly suggestive photographic identification likewise it can not obviate the initial prejudice. No reason was advanced by the State justifying or explaining the exhibition of photographs to the witness prior to conducting a line up when the suspect was in custody. The only apparent reason for such procedure is the reason for which such practice is condemned namely the creation of a predisposition by the witness to later re-identify the suspect. (See *U.S. v. Zeiler*, 427 F.2d 1305.) As observed in *Palmer v. Peyton*, 359 F.2d 199, the State may not rely on an identification secured by a process in which the search for truth is made secondary to the quest for a conviction.

In the case at bar the potential for misidentification is enhanced because the witness is a twelve year old girl probably more susceptible to suggestion

and less capable of discerning the presence of suggestion. The effect of the prior out of court identification as applied to this young witness becomes even more serious in light of the questions and answers of the witness intending to establish her competence. In emphasizing whether or not the witness had any fear of the consequences of telling a lie the court reinforced the witness's extra judicial identification of defendant. To the extent that falsehood might be involved, it had already occurred, and, if such existed, the witness would be discovered in her falsehood by failing to identify defendant during the court proceeding. This aspect suggests one of the major problems of identification namely it is not merely the truthfulness of the testimony which is involved but rather the probative value of the observational process. An "irrefutable" identification may be just as wrong or mistaken when the result of an honest belief as when the result of deceit.

In view of the nature of the circumstances I see no practical way of rehabilitating the sole identification witness and consequently I believe a conviction based thereon ought to be reversed.